UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CRIMINAL ACTION NO. 11-CR-138-KKC

UNITED STATES OF AMERICA                                            PLAINTIFF

v.

**SENTENCING MEMORANDUM OPINION AND ORDER**

DOUGLAS PATRICK HEALY                                            DEFENDANT

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the loss amount calculation under U.S.S.G. § 2B1.1 used to calculate Douglas Patrick Healy's United States Sentencing Guidelines range. For the following reasons, the appropriate loss amount is the approximate intended loss of $1,400,000, resulting in a 16 level increase in Healy's offense level.

### I.  BACKGROUND

Douglas Patrick Healy pleaded guilty to one count of wire fraud in violation of 18 U.S.C. § 1843. [DE 17]. As part of a plea agreement, Healy admitted to the following conduct:

> Patrick Healy, and others, operate a business in Lexington, Kentucky by the name of Digital Storage Solutions (DSS). DSS markets computer software technology that stores a person's medical history information on a wallet-size card that can be plugged into a computer for access to the information by emergency personnel or doctors. Between 2008 and 2010, Healy, and others, sought to bring investors on board to fund DSS and its operations. In the course of providing potential investors information about his background and the business, Healy made material false representations. These included representations about the extent and nature of his education, his prior business experience, his ownership of numerous patents, the amount of contracts and cards DSS had sold, the existence of partnerships between DSS and other companies, and the circumstances surrounding a prior criminal conviction. In his business dealings with potential investors, Healy received and sent interstate wire communications such as wire transfers of money, emails and telephone calls.

1

Although the Government and Defendant agree to the above facts, they disagree about the details of the scheme and the loss caused by the fraud. The Government and Defendant both argue that the actual loss caused by the fraud cannot be calculated because it is impossible to accurately estimate the residual value of DSS. Therefore, both Healy and the Government maintain that Healy's gain from the fraud must be substituted for loss in calculating the Guidelines. The Government presented evidence to support its calculation of gain, but in so doing, presented sufficient evidence to calculate a reasonable estimate of the intended loss. Based on Healy's admissions in the Plea Agreement, the testimony presented at the sentencing hearing, the documentary evidence submitted at the same hearing, and the information contained in the Presentence Report, the Court finds the following facts by a preponderance of the evidence.

This scheme begins with Barbara and Max Smith, a retired couple from Richmond, Kentucky enjoying their golden years traveling. When traveling, Barb and Max worried if they required emergency care, medical personnel would not have access to their emergency contact information or their medical history. From this worry, Barb and Max came up with the idea of a portable medical information card that would contain their medical records and emergency contact information stored in a database. The stored information would then be accessible to EMTs and other medical professionals by plugging the card into a computer. Some information would be stored directly on the card, but the vast majority of medical and emergency contact information would be stored on the internet. The card would act as the device to access the information.

Barb and Max contacted Wendell Wilson, an IT specialist in Richmond, Kentucky to develop the technology necessary to create and operate the card. The three of them formed KWS,

2

LLC, later known as VitalLife ID and LifeNet Technologies, LLC (hereinafter "VitalLife"). Wendell developed the software to run the card and found a dealer to manufacture the hardware—that is the card itself. After developing a prototype and a business plan, VitalLife needed someone to sell the card. Enter Patrick Healy. In the spring of 2008, VitalLife contracted with Patrick Healy and his company DSS to market and sell VitalLife's cards.

Barb and Max envisioned that the card would be sold to travelers, mostly retirees, and wanted to focus on sales to small groups to ensure the card worked. Healy had different ideas and wanted to sell large quantities of cards to large companies. As Barb, Max, and Wilson soon learned, Healy's big ideas and goals were implausible and would form the basis for his fraud. During Healy's 90 day probationary period, he did not sell a single card. Barb and Max also noticed that Patrick was difficult to "pin down," and that he was allegedly soliciting investors in Kentucky and Utah.

Jason Farr was one of the investors Healy allegedly solicited in Utah. Although Farr has an ongoing dispute with DSS, his testimony regarding his interactions with Healy is credible and supported by tape-recorded conversations. Farr testified that when he first met Healy in January 2009, Healy made it "crystal-clear" to Farr that "he had developed the card, the hardware, the software" in addition to owning 27 patents. This was all false. Healy was simply the salesman who had a contract to sell the cards. Never letting facts get in the way of a good story, Healy told Farr that he needed money quickly to fund an imminent sale. This, of course, was false. Farr invested with DSS and obtained a license to sell the product. The terms of this agreement, Farr's interest in DSS, and his rights to sell the product are hotly disputed issues but not relevant for this inquiry. What is relevant, however, is Farr's direct knowledge and recordings of Healy's gross misrepresentations and outright lies to investors and potential clients.

Based largely on Healy's misrepresentations, Farr and his business partner John Coram sought potential customers for the VitalLife card. Healy told Farr that he—not Barb, Max and Wilson—was the developer and creator of the product and its underlying technology. Based on this misrepresentation, Farr set up meetings with potential clients and relied on Healy to make the sales pitch. L-3 Communications, a company in Salt Lake City was interested in purchasing upwards of 63,000 cards. According to Farr, "Patrick blew their socks off" with his presentation. Healy said that within a week, he would send L-3 a PowerPoint presentation of everything he told them the card could do. After the sales pitch, neither Farr nor L-3 Communications heard from Patrick for months. Patrick's excuse was that he had cancer. In addition to lying about his background, DSS's background, capabilities, and business prospects—Douglas Patrick Healy lied about having cancer.

Farr recorded conversations with Healy, and in one such conversation, Healy apologized for being unable to pay Farr because he had cancer. Healy told Max and Barb that he had cancer and had nowhere to live. Max and Barb opened their home to Healy who told them he was going through chemotherapy. This, of course, was a lie. To perpetuate this lie, Healy shaved his head so that it appeared he was receiving chemotherapy. Healy also told Barb that he needed money to pay his child support because the judge in the case had a personal vendetta against him. Healy walked Barb to the bank and watched her drain her savings account to "help" him pay off his child support. Barb has not been repaid.

Farr also recorded a sales pitch Healy made to Kurt and Joe Rudd. Joe was the administrator for Sun Health, a retirement center in Boise, Idaho. Healy told Rudd that Humana "inquired and made offers to purchase our company." Humana never made any such offer. In yet another pitch, Healy told potential investors that BB&T Bank was using the card. BB&T was

not using the card. Healy not only lied about the card's capabilities but also his own educational and technological training to bolster his credibility. Healy told investors and clients that he had a master's degree from Stanford. A DSS brochure distributed to clients and investors states that "Patrick holds degrees in Business Administration and Computer Science from Wittenberg University as well as an MBA from the University of Kentucky. Later in life, he returned to school and received a Masters in Computer Technology from Stanford University." [Gov't Ex. 2 at 13]. The truth is quite the opposite. Healy spent one year at Wittenberg and left classified as a freshman after earning 39.86 semester credit hours and a GPA of 2.2. Healy then entered the University of Kentucky and stayed for two years earning 84 credits and a GPA of 1.68. Healy did not obtain a degree from Wittenberg or UK and never attended Stanford.

In recorded conversations, Healy misrepresented the technical capacity of DSS and its ability to customize the cards and associated services to serve large scale clients. Healy's most significant misrepresentation of DSS's capabilities is his claims relating to the Center for Rural Development ("CRD"). CRD is a nonprofit that provides support to rural communities including technological and logistical support and training to small law enforcement and first responder departments across rural America. Healy claimed that CRD was going to pay DSS $340,000 in the next 15 days, but that he needed additional funds to finance the product to deliver to CRD. No such deal existed. Healy always had an excuse about why the money from CRD never came.

Healy also sold investors on CRD's infrastructure, project managers, programmers, technical support and customer support. Healy represented to potential clients and investors that DSS had an imminent contract with CRD in which DSS would use CRD's infrastructure to service the large scale contracts that DSS was allegedly on the verge of closing. DSS, of course, did not have such an agreement with CRD and was incapable of providing the support and

5

services that Healy was promising. Despite all of his lies, Healy never entered into a contract to sell VitalLife cards because he was selling a product and associated services that simply did not exist.

Wendell Wilson, the creator of the technology behind the product Healy was allegedly selling, offered persuasive testimony explaining how Healy misrepresented the technology and its capabilities. Wilson concluded that Healy attempted to sell a product that did not exist. Wilson was concerned about his own liability because Healy held out Wilson as the Chief Technology Officer for DSS, which he was not. In addition to misrepresenting Wilson's resume, Healy represented that DSS and Wilson could deliver on large scale projects. DSS did not have the support personnel, servers, and associated infrastructure that would have DSS and VitalLife perform consistent with Healy's representations.

Mark Coleman, a Secret Service investigator does not believe that Healy was trying to sell cards. Coleman believes that Healy "was trying to get the up-front money and basically leave." Although Healy was on the road meeting with potential clients and making sales pitches, he would disappear when it came down to closing a deal and delivering cards. Healy disappeared because he was selling a product and associated services that DSS was unable to provide. Quite simply, although DSS owned the right to sell the cards and eventually purchased the underlying technology, Healy duped DSS's investors not by "pumping" its financials or exaggerating the business prospects for VitalLife cards, he duped DSS's investors by hawking a product, associated services and clientele that simply did not exist. Healy's lies went beyond inflating the value of DSS. He created a fictional product and potential customers to lure investors into financing his global jet-setting.

After Healy was indicted on these fraud charges, DSS formed an Advisory Board to assess its current situation and decide how to proceed. DSS investigated Healy's four month trip to Ghana where he allegedly was close to securing a major contract with the Ghanaian government evidenced by a document allegedly from the Ghanaian government. Healy used this document to "provide existing investors a sense that he had achieved great accomplishments in Ghana and to entice new contacts into investing substantial funds into the Company." [DSS Victim Impact Statement]. The Advisory Board concluded that "after spending hundreds of thousands of dollars over an 18-month period of pursuing contracts in Ghana at the direction of Healy using the fraudulent document as substantiation, the Company has nothing of any substance to show for it and has lost valuable time for pursuing legitimate opportunities." [DSS Victim Impact Statement]. The Advisory Board's conclusion on Healy's Ghanaian adventure appropriately summarizes his entire experience at DSS.

In sum, Healy raised approximately $1.4 million from investors. The Government argues that Healy gained approximately $524,000 from his scheme. Healy is willing to concede that he gained at least $200,000 from the fraud, but not more than $400,000.

## II. ANALYSIS

In *United States v. Triana, Jr.*, the Sixth Circuit provided an overview of how loss should be calculated for purposes of a defendant's adjusted offense level. The court explained:

> U.S.S.G. § 2B1.1 is the Guideline used by courts in determining "loss" for fraud cases. The Guideline enhances a defendant's sentence to correlate to the amount of loss caused his fraud.[1] *See* U.S.S.G. § 2B1.1(b)(1). Application Note [3] to § 2B1.1 provides guidance for the determination of loss. The application note states that "loss is the greater

---

[1] The Guidelines increase the offense level by 12 for a loss more than $200,000, by 14 for a loss of more than $400,000, and by 16 for a loss of more than $1,000,000. U.S.S.G. § 2B1.1(b)(1).

7

of actual loss or intended loss." *Id.* § 2B1.1, cmt. (n.[3]) (20[12]).[2] "[A]ctual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1, cmt. (n.[3](A)(i) and (ii)). In situations where the losses occasioned by financial frauds are not easy to quantify, the district court need only make a reasonable estimate of the loss, given the available information. *Id.* § 2B1.1, cmt. (n.[3](C)). Such estimates "need not be determined with precision." *United States v. Miller,* 316 F.3d 495, 503 (4th Cir. 2003).

468 F.3d 308, 319 (6th Cir. 2006) (footnotes omitted).

If the loss cannot be reasonably determined, the Court must instead use the gain that resulted from the offense. *United States v. Warshak*, 631 F.3d 266, 329 (6th Cir. 2010) (citing U.S.S.G. § 2B1.1 cmt. n. 3(b)). The Government and Defendant argue that loss cannot be calculated because the victims still own an interest in DSS, a company that has some residual value; a value that is difficult if not impossible to calculate. The Government and Healy reach this conclusion by focusing only on the actual loss and ignoring the intended loss. Both parties ignore, however, that before using gain as a substitute, the Court must first attempt to calculate actual loss or intended loss—whichever is greater. While the Court agrees that actual loss cannot be calculated in this case, for the reasons discussed below, the Court is able to make a reasonable estimate of the intended loss from Healy's scheme.

In calculating loss, fraud cases are typically distinguished between the creation of a "sham" company and "pump-and-dump" schemes. *See United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007). When fraud is exposed in the context of a sham company, the underlying company has no value and its stock or equity is worthless. *Id.* In those cases, the loss is appropriately determined as the value of all outstanding shares before the fraud came to light or

---

[2] The 2012 Guidelines contain the same language as the 2002 Guidelines which was used in *Triana, Jr.*, but that language is now in Note 3.

8

the total investment that the victims lost. *See id.* Measuring loss in a "pump-and-dump" scheme is more complex, however, because after the fraud is exposed, the stock or equity in the company has some residual value. *Id.* Therefore, "the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes." *Id.* (citing *United States v. Bakhit*, 218 F. Supp. 2d 1232 (C.D. Cal. 2002)).

In this case, Healy perpetrated a fraud more similar to a pump-and-dump scheme by inflating DSS's technology and sales prospects. While the end result of the fraud resembles a pump-and-dump scheme because the victims retain interests in DSS, which has residual value, Healy's pitch to investors was a sham. Healy did more than simply exaggerate the business prospects of DSS and its potential for growth; Healy lied about every major aspect of DSS and, in effect, created a sham corporation. Despite Healy's actions, however, DSS was left with residual value.

Initially, Healy lied about his personal background, education and business experience. Investors thought they were investing in a company led by a Stanford graduate with a successful business background. Instead, they were trusting their money with a salesman lacking a college degree, with no successful technology experience and who had been previously convicted of fraud (and subsequently pardoned).

Healy told investors that DSS owned the technology behind the cards and the associated patents. In reality, DSS did not acquire ownership of the technology and associated patents until 2009, after investors had laid out cash. Investors were told that DSS had relationships with and was on the verge of signing major contracts with large corporations including BB&T, Humana,

9

and CRD. Healy claimed that DSS, possibly with the assistance of CRD, would provide the necessary infrastructure and logistical support to service the major contracts. Healy led potential clients and investors to believe that DSS had access to call centers, servers, and associated technological support to properly support a large sale of cards. All these representations were materially false.

If Healy's fraudulent activity had gone undetected, DSS would have been rendered worthless and investors would have seen no return. Healy spent his time, and the investors' money, selling a nonexistent product based on technology that DSS did not own, supported by services and infrastructure that DSS could not provide. Healy used the money that he raised not to invest in DSS in an attempt to deliver on his fraudulent promises, but to support a lavish lifestyle traveling around the world, staying in expensive hotels, driving expensive rental cars, and eating out at expensive restaurants.

The end result of Healy's scheme resembles a pump-and-dump only because DSS eventually acquired the technology that Healy claimed to own and, under new leadership, is beginning to move forward by attempting to sell products that it can actually deliver. These positive developments have not occurred because of anything Patrick Healy did or created. In fact, DSS is beginning to realize its potential value because Healy's fraud was discovered and stopped. The evidence shows that Healy only intended to perpetuate his fraudulent activity in support of his expensive lifestyle.  Ultimately, his conduct would have resulted in a total loss to investors. Healy's intention was not to "pump" the value of DSS and then "dump" it at an inflated price and leave investors with a company worth less than they thought. Healy's intent was to take a grain of truth and create a series of elaborate lies to induce investors to buy into a

company that was selling a non-existent product. DSS, would then operate as Healy's personal bank account to support his lifestyle.

The fact that Healy's crime was discovered and DSS was salvaged before it was a total loss does not change the intent of Healy's actions. The victims invested in a speculative and emerging company that was raising capital to acquire technology, develop a marketable product, and beginning to foster commercial relationships. Patrick Healy did not sell and did not intend to sell this company or even an inflated version of this company to investors. He sold them his sham company—a company that owned the technology and was on the verge of landing major contracts to supply thousands of cards and associated services to major clients. In Healy's intended scheme, the investors were never going to see a dime of their money back because what Healy was selling did not exist and DSS under Healy's leadership was worthless.

The distinction between intended loss and actual loss is important. In one case, the Sixth Circuit reversed a finding that all of a company's revenues constituted actual loss even though the company's operations "were permeated with fraud" because "there [was] no evidence suggesting that literally every customer was deceived by [the company's] misrepresentations." *United States v. Warshak*, 631 F.3d 266, 329 (6th Cir. 2010). The court noted, however, that "[o]f course, a district court may rely on *intended* loss when determining the amount of loss under the Guidelines." *Id.* at 330.

This decision is also guided by Judge Posner's discussion of loss in *United States v. Schneider*, 930 F.2d 555 (7th Cir. 1991). In that case, the defendant was convicted of fraud for submitting a bid to the General Services Administration ("GSA") that falsely certified that he had not been charged with a criminal offense in the past three years. *Schneider*, 930 F.2d at 556-57. The defendant was the low bidder and won the bid, but before performance began or any

payment was made under the contract, the GSA canceled it "and awarded the job to another—considerably higher—bidder." *Id.* at 557. The court discussed the methods of calculating "intended, probable, or otherwise expected loss . . . in a case such as this where the fraud is discovered or otherwise interrupted before the victim has been fleeced." *Id.* at 558. The court distinguished between two types of fraud. First, is the "true con artist [who] does not intend to perform his undertaking, his contract or whatever; he means to pocket the entire contract price without rendering any service in return." *Id.* "In such a case the contract price is a reasonable estimate of . . . expected [or intended] loss . . . ." In the other type of fraud, the defendant obtains a contract that he "might otherwise not obtain" and intends to "perform the contract [and] pocket, as the profit from the fraud, only the difference between the contract price and his costs." *Id.*

*Schneider* represented the second type of fraud because the defendant intended to perform the services required by the contract and was going to keep only the difference between the contract price and his costs as profit. This contrasts with cases where a "borrower . . . ha[s] no intention of repaying her loans." *Id.* at 559 (citing *United States v. Johnson*, 908 F.3d 396, 398 (8th Cir. 1990)). In those cases, "the fact that the victims might have been able to recover some of the money taken from them . . . no more reduce[s] the victims' loss in the contemplation of the law than if a pickpocket got cold feet and returned his victim's wallet before the victim discovered it had been missing." *Id.* "The crime is complete when the thief obtains the victim's property. What happens later is irrelevant." *Id.* (citation omitted).

Healy's fraud is the type in which he has no intention of repaying his loans or returning value to investors. The evidence is abundantly clear that Healy was not performing on his promises. Healy's trips and sales presentations had no prospect of realizing value for investors and were intended to attract new investors and continue the fraud. Healy returned no value to

DSS's investors and when he sold them on his sham company, "[t]he crime [was] complete." The fact that DSS has residual value now is irrelevant to calculating Healy's intended loss.

### III. CONCLUSION

For the foregoing reasons, the intended loss from Defendant's fraud is reasonably estimated at $1,400,000—the amount Healy fraudulently raised from investors. The fact that DSS has residual value is of no consequence to calculating the intended loss. Accordingly, Defendant's adjusted offense level is increased by 16 levels.

Dated this 13th day of August, 2012.

Signed By:
Karen K. Caldwell
United States District Judge